Filed 12/5/22  P. v. Fuller CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E078952 |
| v. | (Super.Ct.No. FSB18424) |
| BRUCE LAMONT FULLER, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Gregory S. Tavill, Judge.  Affirmed.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Respondent.

Defendant Bruce Lamont Fuller appeals from an order denying his application, made pursuant to the mandates of *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*),

1

but requesting that we reconsider his conviction and sentence in light of claims of fraud and violations of due process. We appointed counsel to represent defendant on appeal, and counsel filed an opening brief raising no arguable issues. (*People v. Wende* (1979) 25 Cal.3d 436 (*Wende*); *Anders v. California* (1967) 386 U.S. 738 (*Anders*).) Defendant was invited to submit a supplemental brief on his own behalf, which he has done, arguing that the trial court denied his due process rights by refusing to allow him to present live testimony at the *Franklin* hearing in order to "create an accurate record of facts" for his youthful offender parole board hearing. We affirm.

## BACKGROUND

The facts of the offense are taken from our opinion on direct appeal in *People v. Fuller,* E024678 (nonpub. opn., filed September 29, 2000), supplementing where needed with current information.

Donald Beck (Beck), a 72-year-old paraplegic, owned and operated a jewelry store, Beck's Jewelers, with other family members, including his sister, Eleanor Jean Aleksich. Beck lived at 3536 Stoddard in San Bernardino. Although he lived alone, Aleksich spent every Wednesday night at Beck's house to clean and run errands.

At approximately 2:15 a.m. on March 25, 1998, Beck was awakened by a man wearing a ski mask and standing over him with a gun held to his temple. Another man without a gun stood by the door of his bedroom. The men were two of three intruders, all of whom wore ski masks and surgical gloves. Beck identified the three intruders, based

2

on their height and weight, as defendants Fuller, Randall, and Wilson. Beck described the man identified as Wilson as the one holding the gun and giving the orders.

As Wilson held the large, "automatic" gun to Beck's temple, he asked Beck where all the money and jewelry was in the house. Beck told Wilson that the items were on the kitchen table. Wilson took the watch, two rings,[1] a bracelet, and Beck's money clip with over $200 from the kitchen table. In an angry tone, Wilson also asked Beck for his Cadillac and the pink slip. Beck responded that he did not know where the pink slip was. When Beck said, "'go ahead and pull the trigger,'" Wilson hit Beck's nose "very, very hard" with the butt of the gun, causing his nose to bleed. At some point, Wilson told Beck that he would have to accompany the intruders to his jewelry store. Beck responded, however, that they would have to carry him because he could not walk. To this, Wilson remarked that they would use the "girl from the other room" to gain access to the store.

Aleksich was awakened by a firm hand on her shoulder and a gun pressed "real hard" against her head, forcing her head down into the pillow. Aleksich described the gun as a black or gray, "automatic" one. Another man was also in Aleksich's room. One of the intruders felt Aleksich's body to ensure that she was unarmed. Aleksich identified the man with the gun, by his size alone, as Wilson. Wilson put a blanket over Aleksich's head and told her to cooperate or she would get hurt. The two men wanted the combinations to the alarm and the safe at the jewelry store. Although Aleksich gave the

---

[1] Among the personal items stolen from Beck was a one karat diamond ring appraised at $6,200.

men the requested information, they eventually decided to take her with them. With a gun at her head, Wilson held on to Aleksich's shirt and took her to Beck's room. A third man was with Beck.

Wilson told one man to stay with Beck while the others went to the store. Wilson further instructed, "'We don't get back here, you take care of him.'" Beck identified the one who stayed with him as Randall.

After finding the keys to the store in the Cadillac in the garage, Wilson walked back into the house and stood by the kitchen table. Because Aleksich's Oldsmobile was parked behind the Cadillac, they decided to take her car.

Wilson and Fuller left in the Oldsmobile with Aleksich. As Aleksich sat in the passenger seat, Fuller sat behind her with a gun to her head.[2] Wilson drove extremely fast and recklessly. En route, Wilson and Fuller realized that they had forgotten the store keys on the kitchen table. They drove back to the house, where Fuller quickly retrieved the keys. They continued on toward the store. Wilson apparently knew the store's location without being advised by Aleksich. He even remarked, "'Lady, you just don't know how long we been watching you.'"

When they arrived at the store, Aleksich opened the store, turned off the alarm, and opened the safe, where the expensive jewelry was stored. Wilson and Fuller removed the jewelry from the safe and into a dark, plastic trash bag. As they attempted

---

[2] During his interview with Detective Steven Lowes, Fuller denied having a gun. Fuller's statements were only presented to Fuller and Randall's jury, and the court admonished the jury to consider the statements only in determining Fuller's guilt or innocence.

to take a gray box containing customer repairs, Aleksich asked them not to take it because the jewelry in the box, as well as all the jewelry in the store, was not insured. Wilson and Fuller complied with Aleksich's request. Next, Fuller began to break the glass display cases with the butt of his gun, which was described as a revolver. A total of $40,000 in jewelry was taken from the store.

Wilson and Fuller drove back to the house with Aleksich. Aleksich testified that, "at this point I feared for my life because I figured when they got me back to the house, that my brother and I were both going to be shot."

Meanwhile, back at the house, Beck, who was shaking, mad, and still in pain from the nose injury, told Randall that he thought that he might have a heart attack. Randall responded, "'Please don't die because no one is supposed to get hurt.'" At some point, Randall took a chain from around Beck's neck.

When Wilson and Fuller arrived at the house, Wilson told Aleksich to sit on the couch, put her head between her knees, and her hands over her head. Although Beck was still in his room, the sound of his voice assured Aleksich that he was still alive. At the house, the intruders took items, including a television, VCR, and a large shield with two swords. They ransacked the house, opening all the drawers. They also took or disconnected all the phones. After Aleksich told them to take her car, the three men departed in her Oldsmobile.

Beck and Aleksich called the police on a neighbor's phone. Officer Robert Young was the first officer to arrive at Beck's home. After contacting Beck and Aleksich,

5

Young looked around the house. By a window located at the west side of the house, Young noticed a couple of patio chairs stacked on top of each other. Young also noticed a window lying in the grass around the same vicinity. Inside the house, Young noted that there were items missing from almost every room.

At approximately 7:00 p.m. on March 26, 1998, Robert Yandell, an identification technician, responded to a call at 1277 East Amanda in San Bernardino. There, he observed a white Oldsmobile. Aleksich's car was returned undamaged.

The Sterling Apartments are located about three blocks away from where the car was found. There, Randall lived in an apartment with his aunt, Beatrice Sims. Randall, Fuller, and Wilson were cousins or close friends. Fuller also lived with Sims from late 1997 to April of 1998. In April of 1998, Fuller moved into his girlfriend, Shanisha McDowell's, apartment in the same complex.

On April 4, 1998, a security guard contacted Wilson, who had in his possession a black, .40-caliber, Glock semiautomatic handgun. This was the same type of gun used by the ringleader during the robbery.

Later that same month, an officer observed Fuller driving a 1990 Toyota Camry. A .22-caliber revolver, which appeared to be the same revolver used during the robbery of the jewelry store, was found in the Camry.

On April 22, 1998, Detective Lowes arrested Fuller, who was wearing jewelry stolen from Beck's store. After Fuller told Lowes where he lived, Lowes, accompanied by other officers, went to Shanisha McDowell's apartment. Lowes obtained consent to

6

search the apartment. In McDowell's bedroom, Lowes found a TV and a black phone taken from Beck's house. In McDowell's closet, Lowes found a black trash bag containing 119 pieces of jewelry, some of which were still in display cases or jewelry boxes. Other pieces of jewelry, some cash, and some surgical gloves were found in McDowell's closet or room. Mia Richards, McDowell's mother who lived with McDowell, was wearing a gold ring and watch that were stolen from the store.

During her videotaped interview with Lowes, McDowell admitted that Fuller, Randall, and Wilson brought the jewelry, television, and telephone into her apartment a few days after March 23, 1998.

In March of 1998, Wilson gave his girlfriend, Michelle Parris, a gold necklace in a Beck's jewelry box. Lowes searched Wilson's property and found other jewelry stolen from Beck's Jewelers.

Approximately 50 pieces of jewelry stolen from Beck's Jewelers were discovered at pawn shops in San Bernardino, West Covina, and Azusa. A search of duplicate receipts from the pawn shops revealed that Randall had pawned items stolen from Beck's store from March 27, 1998, to April 21, 1998. Lowes arrested Randall on April 23, 1998. At the time of his arrest, Randall was wearing jewelry stolen from Beck's Jewelers.

In a second amended information filed on January 21, 1999,[3] Wilson, Fuller, and Randall were charged with the following offenses: first degree residential burglary (Pen.

---

[3] Although the second amended information is labeled "amended information," the first amended information was filed on December 4, 1998.

7

Code, §§ 459 & 462, subd. (a))[4] (count 1); second degree commercial burglary (§ 459) (count 2); home invasion robbery in concert against Beck (§§ 211 & 213, subd. (a)(1)(A)) (count 3); home invasion robbery in concert against Aleksich (§§ 211 & 213, subd. (a)(1)(A)) (count 4); kidnapping for carjacking (§ 209.5, subd. (a)) (count 5); kidnapping to commit robbery (§ 209, subd. (b)(1)) (count 6); carjacking (§ 215, subd. (a)) (count 7); unlawful driving or taking of a vehicle (Veh. Code § 10851, subd. (a)) (count 8); and assault with a semiautomatic firearm (§ 245, subd. (b)) (count 9). Defendants were also charged with the following firearm enhancements: a principal was armed with a firearm during all counts (§ 12022, subd. (a)(1)); each defendant personally used a firearm during counts 1, 2, 8, and 9 (§ 12022.5, subd. (a)); and each defendant personally used a firearm during counts 3, 4, 5, 6, and 7 (§ 12022.53, subd. (b)). Wilson was charged with two prior prison convictions within the meaning of section 667.5, subdivision (b).

The trial court impaneled one jury for Fuller and Randall and a separate jury for Wilson. The trial court dismissed counts 5 and 7 under section 1181.1. At the end of trial, Wilson's jury found him guilty of all the remaining counts and true all the firearm allegations. Fuller and Randall's jury found both defendants guilty of the remaining charges. In regards to Randall, the jury found not true all the firearm allegations. The jury found that Fuller was armed with a firearm within the meaning of section 12022, subdivision (a)(1) as to all counts. The jury also found that Fuller was personally armed

---

[4] All further section references will be to the Penal Code unless otherwise stated.

with a firearm within the meaning of section 12022.53, subdivision (b) or section 12022.5, subdivision (a)(1) as to counts 4, 6, and 8 only.

After finding Wilson's prior conviction allegations true, the trial court sentenced Wilson to a total prison term of 39 years and 8 months to life. The court also sentenced Fuller to a total prison term of 20 years to life and Randall to a total term of nine years to life.

The defendants appealed. On direct appeal, we reversed the jury's finding that Fuller personally used a firearm in committing the home invasion robbery of Aleksich. We also struck Fuller's one-year enhancements for being armed with a firearm in committing the crimes alleged in counts 6 and 8. In all other respects, we affirmed the judgment. (E024678, typed opn., pp. 17-20, 36.)

On January 7, 2019, defendant filed a petition for resentencing pursuant to former section 1170.95, although he acknowledged he was not convicted of murder. On November 8, 2019, the court's minute orders refer to a continuance of a *Franklin* hearing, and the proceedings from this point forward were treated as such. On September 23, 2021, the court denied counsel's oral motion to present live testimony respecting a separate criminal charge for which defendant claimed to have been denied a preliminary hearing.

After numerous continuances related to changes in counsel and delays due to the Covid-19 pandemic, on February 16, 2022, defendant filed a motion seeking to present live testimony of four witnesses, who were proffered to challenge certain enhancement

9

allegations pertaining to firearm use or possession. Attached to the motion were exhibits, including some related to defendant's youth and maturity at the time of the offenses, as well as his growth and maturity since his incarceration.

On April 7, 2022, the *Franklin* hearing was held. The court concluded it lacked jurisdiction to resentence the defendant because it had already corrected the sentence to strike firearm enhancements after the remittitur issued. The court explained that more than 120 days had lapsed to recall the sentence, and that section 3051 automatically modified defendant's parole eligibility so that a resentencing petition was inappropriate. The court took the resentencing issue off calendar. Regarding the *Franklin* issue, the court directed the clerk to transmit the documents submitted by defendant to the California Department of Corrections and Rehabilitation, except for two exhibits.[5]

Defendant appealed.[6]

## DISCUSSION

This court appointed counsel to represent defendant appeal. After examining the record, counsel filed an opening brief pursuant to *People v. Wende*, *supra*, 25 Cal.3d 436 (*Wende*), that raises no issues and asks us to independently review the record. We invited defendant to submit a supplemental brief, which he has done, arguing that his due process

---

[5] The court redacted the two excerpts of police reports.

[6] Defendant has made multiple requests to augment or correct the record on appeal. The first three were previously ruled upon. On November 14, defendant filed another request claiming the record has not been corrected. We deny this most recent application because all the minute orders requested are already included in the corrected Clerk's Transcript (CT pp. 85-88). The other items sought have been addressed in our previous order dated September 28, 2022.

rights were violated by (a) not "allowing" the People to respond to his motion for resentencing before taking the matter of calendar, and (b) not permitting him to present live testimony to collaterally challenge the original judgment in order to give defendant the opportunity to "make an accurate record of actual facts of Case No. FSB-18429-2."

Defendant's arguments lack merit. Pursuant to the mandate of *People v. Kelly* (2006) 40 Cal.4th 106, 124, we address the contentions raised by defendant and explain why they fail.

1.      *The Trial Court Properly Took the Resentencing Issue Off Calendar Due to Lack of Jurisdiction.*

At the hearing on defendant's motion, the trial court was under the impression that the resentencing sought was to correct an oversight, specifically, the court believed the motion was filed because the trial court had never acted on the remittitur, to resentence the defendant following our reversal of the firearm enhancements in the original appeal. After further argument, the court realized defendant sought resentencing to reconsider the entire sentence by presenting new evidence as to one of the counts. The court attempted to explain that a petition for a writ of habeas corpus was the proper mechanism to bring to the court's attention changes in the law that affect the validity of a sentence, but that it lacked jurisdiction to recall it when more than 120 days has passed since the pronouncement of that judgment.

The trial court was correct. "Under the general common law rule, a trial court is deprived of jurisdiction to resentence a criminal defendant once execution of the sentence

11

has commenced." (*People v. Karaman* (1992) 4 Cal.4th 335, 344, citing *Dix v. Superior Court* (1991) 53 Cal.3d 442, 455; *Holder v. Superior Court* (1970) 1 Cal.3d 779, 783; see also *People v. Hernandez* (2019) 34 Cal.App.5th 323, 326.)

Thus, after a judgment is final, there must be a jurisdictional basis for a court to act, whether by a special statutory procedure (e.g., §§ 1170, subd. (d)(2) [petitions to recall sentences of life without possibility of parole for youthful offenders] 1170.18 [redefining theft offenses involving less than $950 as misdemeanors], 1170.91 [recall for resentencing for military related condition], 1170.126 [petition to recall a three strikes sentence where third strike was not serious or violent], or 1172.6 [petition for resentencing of persons convicted of felony murder or under natural and probable consequences doctrine]), or other procedural vehicle, such as a collateral challenge to the constitutional or jurisdictional basis for a conviction or sentence by way of habeas corpus, or other similar procedure.

It is true that an unauthorized sentence "'do[es] not become irremediable when a judgment of conviction becomes final, *even after affirmance on appeal.*'" (*In re Harris* (1993) 5 Cal.4th 813, 840, quoting *In re Winchester* (1960) 53 Cal.2d 528, 531.) But to invoke this rule the court must have jurisdiction over the judgement. (*In re G.C.* (2020) 8 Cal.5th 1119, 1130.) As the Supreme Court explained in *In re G.C., supra,* "*Harris*, for example, involved a writ of habeas corpus challenging the judgment of conviction giving rise to the petitioner's custody." (*Id.* at p. 1130.) The habeas procedure gave the court authority to review the judgment. However, in the present case, defendant used a vehicle

with limited utility and his sentence, as modified after our original opinion on direct appeal, was not unauthorized; it is the factual basis for the conviction and attendant firearm enhancement that he challenges.

It was apparent from the several hearings that the trial court was led to believe the resentencing issue was related to the *Franklin* issue, until the final hearing. Prior to that time, the only written petition was one filed by defendant *in propria persona* requesting resentencing pursuant to former section 1170.95 (now renumbered as section 1172.6). Without explanation, when the initial hearing on that petition was conducted, counsel for one of the codefendants, who had appeared with respect to the appointment of counsel, mentioned a *Franklin* hearing recently held for his client, and from that point forward the minutes of all further hearings referred to the current proceeding as a *Franklin* hearing.

Defendant did not file a formal motion or application pursuant to the *Franklin* procedure until February 16, 2022. At that time, defendant also filed a request to present live testimony of several witnesses whose testimony would relate to a gun allegation in one of the counts of defendant's conviction, which was final. It was only when questioned about the need for testimonial evidence, and counsel's explanation that the resentencing was unrelated to the Court of Appeal's opinion in the original appeal, directing that several firearm enhancements be stricken, that the court realized the issue was a collateral challenge to the conviction, which was now final.

Because that issue was unrelated to the statutory procedure for resentencing certain youthful offenders (for which there is a separate statutory procedure conferring

13

jurisdiction) and because the issue had not been raised by a vehicle which would have given the trial court jurisdiction to act, it lacked jurisdiction to entertain a challenge to the questioned charge.

Because there was no jurisdiction to hear the motion, the trial court was not required to compel the People to file a response. There was no due process violation.

2.      *The Franklin Procedure Does Not Authorize Relitigation of Final Conviction By Way of New Evidence.*

Defendant also argues that the matters presented in his petition and motion procedure, and the live witness testimony proffered, should have been considered by the court in the *Franklin* hearing. Specifically, he argues that the *Franklin* decision gives "both side's [*sic*] the opportunity to make an <u>accurate record</u> of the facts for the future youth offender's parole board hearing." The witnesses who defendant proposed to call at the hearing were offered to prove that defendant was not in possession of a firearm in relation to one of the counts of conviction. In other words, defendant interprets the *Franklin* decision as allowing a defendant to reopen an already final conviction to introduce new evidence, so a different version of the "accurate facts" can be placed before the Board of Prison Terms. Not so.

In *Franklin*, the Supreme Court reviewed the new statutory provisions geared at insuring a youthful offender is considered for parole, and remanded the matter to the trial court for a determination of whether Franklin was afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing. (*Franklin,*

14

*supra,* 63 Cal.4th at p. 284.) It went on to explain, "If the trial court determines that Franklin did not have sufficient opportunity, then the court may receive submissions and, if appropriate, testimony pursuant to procedures set forth in section 1204 and rule 4.437 of the California Rules of Court, and subject to the rules of evidence. *Franklin may place on the record any documents, evaluations, or testimony (subject to cross-examination) that may be relevant at his eventual youth offender parole hearing, and the prosecution likewise may put on the record any evidence that demonstrates the juvenile offender's culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors.* The goal of any such proceeding is to provide an opportunity for the parties to make an accurate record of the juvenile offender's characteristics and circumstances at the time of the offense so that the Board, years later, may properly discharge its obligation to 'give great weight to' youth-related factors (§ 4801, subd. (c))." (*Id.*, at p. 284, italics added; see also *People v. Rodriguez* (2018) 4 Cal.5th 1123, 1131-1132 [because defendant was sentenced prior to passage of Senate Bill No. 260, he was deprived of the opportunity to introduce evidence of youth-related factors].)

In short, the procedures envisioned by *Franklin* and its progeny were not intended to create a new vehicle for collateral challenges to a final conviction or sentence, as suggested by defendant. Instead, the proposed hearings were intended to provide a vehicle for memorializing information about a defendant's youthful characteristics and circumstances at the time of the offense, so that the Board may give the appropriate weight to youth-related factors when considering his eligibility for release on parole.

Here, defendant's counsel submitted voluminous documents attesting to defendant's youth and his circumstances at the time of the offense. Those materials included positive "chronos" from the state prison (attesting to positive efforts and conduct while incarcerated), a psychological evaluation, the social study portion of the probation report, supportive declarations of friends and family, and certificates showing his emotional growth and education while in prison. The trial court directed that these materials be transmitted to the CDCR, as contemplated by *Franklin* and its progeny, including Senate Bill No. 260.

The starting point for a due process question is determining what process is due. (See *Cleveland Bd. of Educ. v. Loudermill* (1985) 470 U.S. 532, 541 [105 S.Ct. 1487, 1493, 84 L.Ed.2d 494, 503].) Here, the trial court accepted the *Franklin* materials submitted by defendant's counsel and ordered them transmitted to the CDCR. That was the process that was due pursuant to *Franklin*, and defendant has not successfully shown that he is entitled to challenge a conviction or sentence in the *Franklin* process. Thus, no due process violation has occurred by denying defendant's attempts to retry part of his original conviction.

There was no error.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ _____

P. J.

We concur:

McKINSTER _____

J.

FIELDS _____

J.

17